# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Criminal Case No. 19-mj-00277**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**

**MATTHEW BRENT GOETTSCHE,**

     **Defendant.**

---

## UNITED STATES' MOTION FOR GOETTSCHE'S PRETRIAL DETENTION

---

The United States of America, by and through David Tonini, Assistant United States Attorney (the "Government"), pursuant to the Bail Reform Act at Title 18, United States Code, Sections 3142(e), respectfully moves this Court to order that defendant Matthew Brent Goettsche ("Goettsche") be detained pending his trial in the U.S. District Court for the District of New Jersey. As discussed further herein, in light of, *inter alia*, Goettsche's very serious criminal conduct, which involves his lying to investors around the world to a degree that makes his sentencing exposure close to twenty years' imprisonment; his significant financial holdings, which appear to include many multiple millions of dollars scattered amongst various bank and cryptocurrency accounts around the world; and Goettsche's extensive foreign contacts, travel, and properties—including his codefendant who remains at large and likely outside the United States—there is no combination of conditions to ensure that, if released, Goettsche will remain to stand trial and be held accountable for the millions of investor dollars he procured through fraud. In addition, given the nature of the scheme Goettsche created—a sprawling fraud that attracted victims online but operated behind the scenes on cloud-based programs and that was predicated

on difficult-to-trace cryptocurrency transactions—Goettsche and any coconspirators who have

not yet been arrested or charged have the infrastructure and know-how to regenerate the same

basic scheme from anywhere in the world under a different name, further victimizing

unsuspecting investors hoping to profit from cryptocurrency. Accordingly, pretrial detention is

appropriate.

## I.      <u>Pending Action in U.S. District Court for the District of New Jersey</u>

This matter is before this Court by way of an arrest warrant issued from U.S. District

Court for the District of New Jersey. On December 10, 2019, Goettsche was arrested at his

home because he stands charged by an Indictment containing two counts, *see* Crim. No. 19-877

(CCC), redacted copy attached hereto as Ex. A (the "New Jersey Indictment"). Count One

charges Goettsche and others with conspiring to commit wire fraud, in violation of 18 U.S.C.

§ 1349 (the "Fraud Count"). Count Two charges Goettsche and others with conspiring to sell an

unregistered security contrary to 15 U.S.C. §§ 77e and 77x, in violation of 18 U.S.C. § 371 (the

"Promotion Count").

Both counts relate to Goettsche's creation of and participation in BitClub Network.

BitClub Network is a worldwide fraud scheme that solicited money from investors in exchange

for shares of pooled investments in cryptocurrency mining and that rewarded existing investors

for recruiting new members. From at least April 2014 through December 2019—until he was

arrested—Goettsche has worked with others to create and operate BitClub Network. BitClub

Network operated by a website which, to date, remains online and is seemingly operational.

As set forth in the Indictment, in June 2014 Goettsche spoke with his codefendant Catalin

Balaci—a Romanian computer programmer recently arrested in Germany—about forming a

company that eventually became BitClub Network. Balaci relayed that the margins from the

MLM portion of the business—shorthand for "multi-level marketing," essentially, a Ponzi or pyramid scheme—would be "insane" because Balaci "ha[s] seen [Goettsche's] skill at constructing attractive matrixes that have almost 0 chance of paying more than 50% of max for 99% of the people." In other words, from the start of BitClub Network, Goettsche created a business that promised significant returns.

In the beginning of the scheme, Goettsche worked with Balaci to create a bitcoin cryptocurrency mining pool and to make it appear that BitClub Network had a high volume of hash power, which would make investors and potential investors believe that, if they gave their money to BitClub Network, they would have a good chance at "mining" bitcoin more profitably through the pool than if they attempted to "mine" it themselves. At the beginning of the scheme, Goettsche discussed with Balaci that, in fact, there was no mining power, and Balaci warned that, even if there was, the mining would almost certainly not be profitable. But generating actual mining "profit" was not what Goettsche envisioned for the bitcoin mining pool—he merely wanted "proof" that the BitClub Network was mining in some capacity so that investors would be less worried that they were giving their money to a pyramid scheme and would more easily invest in BitClub Network shares.

Goettsche and others showed investors manipulated figures that he claimed were "mining figures," but really were figures that Goettsche and his coconspirators had either made up or altered. For example, in January 2015, Goettsche challenged Balaci "to get us 'proof' of our own pool." Balaci confirmed, "'proof' ? as in without you having mining power?," to which Goettsche confirmed, "yep" because "that will instantly net us 10x that" and "most of these idiots . . . have no idea . . they just want to make sure we can verify SOMETHING." Once the

pool was created, Goettsche and Balaci altered the figures that were paid out to investors to make it appear that BitClub Network was either more or less profitable, depending on the result Goettsche wanted to achieve. When, for example, Goettsche wanted to attract new investors to BitClub Network, he would instruct Balaci to "bump up" the payout to members. In 2017, Goettsche discussed possible exit strategies from BitClub Network with his coconspirators. As part of that plan, Goettsche proposed that they should "[d]rop mining earnings significantly[.]" Through the course of its existence, BitClub Network has taken in at least approximately $722 million in bitcoin from investors.

In addition, Goettsche worked with others to help promote the sale of shares in BitClub Network while the shares were not registered with the U.S. Securities and Exchange Commission. Goettsche helped to promote the sale of shares by altering and directing the altering of the mining figures displayed to investors, which were displayed on investors' websites. Goettsche also worked to create investor updates that would help promote further sales in BitClub Network. As evidenced by his travel records set forth below, Goettsche along with his coconspirators traveled the world to make BitClub Network.

On December 10, 2019, four of the five defendants charged in the New Jersey Indictment were arrested—three in the United States and one in Germany. The remaining codefendant remains at large and is suspected to be outside of the United States. The Government's investigation remains ongoing, but there are many other individuals responsible for the BitClub Network scheme, both domestically and scattered abroad.

## II. The Section 3142(g) Factors Warrant Goettsche's Pretrial Detention

Under the Bail Reform Act, a defendant may be detained pending trial only if a judicial

officer finds "that no condition or combination of conditions will reasonably assure the

appearance of the person as required and the safety of any other person and the community."  18

U.S.C. § 3142(e).  The Government bears the burden of showing either that there is (1) clear and

convincing evidence that the defendant's release will present a danger to any other person or to

the community; or (2) a preponderance of evidence that the defendant presents a serious risk of

flight.  *See United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).  In determining

whether pretrial detention is appropriate, the Court should consider the factors outlined in

Section 3142(g):

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim, or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> A. the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and recording concerning appearance at court proceedings; and
>>
>> B. whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).  As discussed further below, these factors on balance warrant Goettsche's

pretrial detention.

### A. The Nature and Circumstances of the Offenses Charged

The nature and circumstances of the offenses for which Goettsche is charged in this case warrant pretrial detention. As discussed above, Goettsche has been charged with orchestrating a large-scale cryptocurrency scheme that has spanned the globe and operated via websites. Goettsche specifically planned with his coconspirators that BitClub Network would target unsophisticated investors. For example, in January 2015 Goettsche told Balaci "we are building this whole model on the backs of idiots" and "to prove the mining . . . just means convincing the morons."

At least one of the reasons Goettsche likely wanted "idiots" and "morons" to invest was because the BitClub Network appears to have been structured as a pyramid scheme, with only a portion of investor money actually being invested in anything pertaining to bitcoin mining, with another large chunk actually allocated to existing investors. As Balaci observed in October 2014, "I guess most people do not know only 40% is used for mining and the rest for commissions [for signing new investors up into BitClub]," to which Goettsche remarked, "the leaders know . . . its the sheep that dont." In other words, Goettsche has been charged because he found a way to dupe thousands of investors of hundreds of millions of dollars for his own benefit and for the benefit of his co-conspirators.

As a part of this offense, Goettsche and his coconspirators attempted to set up BitClub Network in a way that would avoid detection by U.S. law enforcement. For example, in April 2016, BitClub Network announced that it was going to "exit" the U.S. market. This did not actually happen—BitClub Network continued to accept U.S. investment—but was merely stated

publicly in an effort to avoid liability down the line. As one BitClub Network promoter stated

bluntly in a BitClub Network promotional video: "[A]fter dealing with all the attorneys and all

the smart-mind crypto guys, they said the best thing you could do was put the [no U.S. investors]

policy up on your site, to have plausible deniability…. it's there to make sure that uh…a hater,

who's related to some district attorney, doesn't send a dog after us to see if there is anything they

can smell[.]" This offense conduct suggests that Goettsche, aware of the illegal implications of

the BitClub Network, took deliberate deceptive steps to avoid detection by law enforcement and

regulators, which militates strongly against pretrial release.

 In assessing the likelihood of flight, the Court should consider Goettsche's four alleged

co-conspirators. The New Jersey Indictment charges Goettsche with conspiring with four other

defendants. Codefendant Joseph Frank Abel—who is only charged with the Promotion Count—

was arrested and ordered detained in the Central District of California due to, *inter alia*, his

significant foreign contacts and travel and the fact that he was arrested several months ago in

Malaysia but had sufficient resources to bribe his way out of custody and flee the country.

Codefendant Jobadiah Sinclair Weeks was arrested in Florida and also travels around the world

extensively. As discussed further below, Weeks and Goettsche appear to have applied for St.

Kitts' citizenship as a result of purchasing fractional interests in the same condominium together,

and Weeks has asked Goettsche if he would allow Sir Richard Branson to stay at Goettsche's

private island in Belize. Codefendant Silviu Catalin Balaci, the Romanian computer programmer

who was arrested in Germany, went to great lengths to avoid detection by members of law

enforcement. For example in a conversation between Goettsche and Balaci in 2015:

| BALACI | all invoices from now on I am filing on the Hong Kong company you sent me |
|---|---|

| BALACI | just so you know |
| GOETTSCHE | yep, good! |
| GOETTSCHE | that entity should be well protected |
| GOETTSCHE | but you never know unless it's challenged |
| BALACI | ☺ |
| BALACI | I know sooooooo little about that world :D |
| BALACI | leagl stuff is beyond me |
| GOETTSCHE | please make sure you take steps to keep this under the radar |
| BALACI | *legal |
| GOETTSCHE | Yea |
| GOETTSCHE | fucking lawyers |
| BALACI | well, I am not broadcasting anything to anyone |
| BALACI | all contractors talk to me only |
| BALACI | and have NDAs signed |
| GOETTSCHE | Good |
| BALACI | and the invoices only get filed to the Ro guv so not public in any way |
| BALACI | nothing is public |
| GOETTSCHE | yep, I mean more on the public info that is out there . . . servers, IP, just make them work to find this entity. If they find it then the fun begins and I will know they have gone past the moat |
| GOETTSCHE | in other words, dont leave the drawbridge down . . . lol |
| BALACI | well, IPs are public, no way around it |
| BALACI | we can hide them under cloudflare |
| BALACI | might be a good idea |
| GOETTSCHE | yes! |
| GOETTSCHE | lets start |
| BALACI | but the IPs are in the DC name and without a Court Order they will not release info |
| GOETTSCHE | take extra steps |
| GOETTSCHE | I will pay for it |

Finally, there is another codefendant—Goettsche's longtime business partner—who remains at large ("Codefendant 1"). Codefendant 1 is believed to be residing outside the United States, has access to at least two private planes, and has been known to travel to countries that do not extradite individuals to the United States. It would be in the interests of both Goettsche and Codefendant 1 for Goettsche to flee and escape with this codefendant to a country without extradition to the United States. Goettsche has had longstanding ties to Codefendant 1 and has

engaged in several business arrangements with him even before the two of them began BitClub

Network. *See, e.g.*, Ex. B (Email from Goettsche referencing that he had "pretty much been

paying [Codefendant 1] under the table as expenses"); Ex. C (Codefendant 1 looping Goettsche

in on the email communications involving the purchase of a plane from a Singapore-based

company that would travel around Jakarta, and referred to "Matt" as his business partner). If

Goettsche were to be released, there is a significant risk that he and Codefendant 1 will

immediately transfer any outstanding BitClub Network money to overseas accounts—adding to

their millions in foreign accounts and portable cryptocurrency wallets—and flee to a

nonextradition country.

But Goettsche's foreign contacts through the course of this scheme do not stop with his

codefendants. Throughout the course of the scheme, Goettsche and his coconspirators traveled

around the world soliciting investments in BitClub Network. As set forth in the New Jersey

Indictment, the scheme amassed at least $722 million in bitcoin from investors. They had

promotional and recruitment held from many individuals worldwide; those individuals have

powerful incentives to hide Goettsche from prosecution and minimize any revelation of their

own culpability. For example, on August 7, 2015, BitClub Network issued an investor update in

which they claimed that they had members in over 80 countries and "continue to grow very fast .

. . all over the world." In 2016, BitClub Network sent out another investor update in which they

claimed that 94% of BitClub Network members were located outside of the United States. As

one court has observed in a case, similarly to this one, involving large-scale international fraud,

"a defendant's alleged ties to a large [ ] syndicate indicate that he has strong connections to

people who have the resources to, ability to, and interest in helping him flee the jurisdiction,

favors denying bail." *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019)

(internal quotations omitted and omission in original).

In addition, predicated largely on the outsized dollar amount of the fraud—at least $722

million of investor money—Goettsche's sentencing exposure is significantly higher than a run-

of-the-mill white collar fraud case.  His advisory guideline range is currently estimated to be

somewhere between 235-293 months' imprisonment.  As other courts have observed, "[w]hen

faced with the possibility of a significant prison term, defendants have a strong incentive to flee."

*Boustani*, 356 F. Supp. 3d at 252; *see United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir.

2018) (summary order) ("a district court does not clearly err in concluding that a defendant

facing a potentially lengthy prison sentence possesses a strong motive to flee")).

### B.  The Weight of the Evidence Against Goettsche

The weight of the evidence against Goettsche in this case is significant.  As outlined in

the New Jersey Indictment, Goettsche repeatedly emailed others and wrote in preserved chat

messages his thoughts and plans to form BitClub Network as a fraud.  For example, in October

2014, Goettsche and Balaci exchanged the following, with Goettsche explicitly telling Balaci

they would need to "fake it" for a while:

| GOETTSCHE | but we may need to fake it for the first 30 days while we get going |
| BALACI | sure |
| BALACI | we can do that |
| GOETTSCHE | it needs to look real though 😊 |
| GOETTSCHE | so need a bit of your magic touch on it |
| BALACI | look real how? We fake real revenue numbers and show them in account daily |
| GOETTSCHE | and we dont want to fake it too good so that when we need to back it down it drops off |
| GOETTSCHE | terminolgy |
| GOETTSCHE | explanation of what is happening |

| GOETTSCHE | inconsistent numbers daily so its not perfect |
| GOETTSCHE | all kinds of stuff |
| BALACI | inconsistent numbers IS real |
| GOETTSCHE | people think we are not legit or are weary so we need to be careful rolling this out |
| BALACI | if we pay consistent numbers it will be fake |
| GOETTSCHE | i know... thats what I am saying, make the numbers inconsistent |
| BALACI | yeah |
| BALACI | will make it real |

In an especially flagrant display of fraud, Goettsche instructed Balaci to manipulate the figures that BitClub Network was displaying to investors as their pro rata share of bitcoin mining earnings:

| GOETTSCHE | bump up the daily mining earnings starting today by 60% |

. . . .

| BALACI | 60%? |
| BALACI | wow |
| BALACI | that is not sustainable, that is ponzi teritori and fast cash-out ponzi |
| BALACI | but sure |
| GOETTSCHE | yea they have not been bumped in a long time |
| BALACI | ok |
| GOETTSCHE | we can push them back down, but we need a boost |
| BALACI | you do realize you need to pay for like 1000 days technically? |
| BALACI | kk |
| GOETTSCHE | we will dilute over time |
| GOETTSCHE | members will think its due to strong growth |
| GOETTSCHE | but right now the payout does not even break people even after 1,000 days |
| GOETTSCHE | we need to look like we will break them even in 9-12 months |
| GOETTSCHE | and then start to curtail it from there |
| GOETTSCHE | just bump it by 60%, im putting together an update about newly installed equip and that we will be showing mining proof in the next week |

In January 2015, Balaci and Goettsche exchanged emails in which Balaci complained that Goettsche had been paying out mining earnings to a degree that was unsustainably high, to which Goettsche responded that they needed the higher figures to drive investment, but that they would just "continue to back it down gradually." *See* Ex. D. On February 10, 2015, Goettsche

11

instructed Balaci, "lets get these two things going…Paying commissions daily and consistent
with solid stats and showing mining stats (even if fudged) then we will be good for awhile and
can focus on behind the scenes."

Later, in September 2017, Goettsche sent Codefendant 1 an email, in which he outlined a
proposed exit strategy for BitClub Network's bitcoin mining pools. *See* Ex. E (Sept. 10, 2017
Email from Goettsche to Codefendant 1). As a part of that plan, Goettsche proposed that
BitClub Network further manipulate the "mining earnings" figures so they can get "RAF!!!!
(rich as fuck)."

There is also strong evidence that BitClub Network was set up to be a pyramid scheme.
A review of BitClube Network's website on May 14, 2018 reflects literal human pyramids in
explaining the "compensation structure" (i.e., the pyramid scheme portion of BCN investor
compensation).



Finally, while outlining all of the Government's evidence against Goettsche is beyond the
scope of this brief, it is worth noting that, in 2019, codefendant Abel posted a video online about
BitClub Network, in which he said:

> Let me give you guys some facts and then you guys can do your
> own due diligence as to why **I think if you are promoting Bitclub
> network today, you are promoting a ponzi.** If Bitclub receives

> no more money, they should be able to pay the 650,000 people
> who have given them billions of dollars in equipment and sales and
> they should have hundreds and hundreds of millions of dollars of
> equipment (which they don't). So, all I can tell you right now is get
> your facts straight. The math is easy. Find out how many
> machines are being ran, how much the electricity cost is. And find
> out all of those GPUs that the company purchased for you and I.
> Find out where . .. otherwise we could have put the mining
> equipment there.

Given the overwhelming evidence of fraud against Goettsche, there is a significant risk

that he will not appear at trial to answer these charges.

### C. The History and Characteristics of Goettsche

#### i. Goettsche's Actions on December 10th Warrant Detention

Goettsche's behavior on the date of his arrest, coupled with seemingly suspicious

circumstances, warrants pretrial detention. Approximately 30 or 45 minutes prior to making

entry into his residence, Goettsche was observed walking outside his house. When law

enforcement approached his house and started knocking, no one opened the door for them. An

unusual amount of time went by, and law enforcement saw what appeared to be a man walk past

the entryway inside of the house from the right to the left. At that point, law enforcement

breached the door.

Upon entry, Goettsche was observed in the doorway of his office, on the left side of the

entryway. The office appeared to be a room that was used to manage a business. For example,

there were at least three cell phones that were plugged in and charging. Preliminary analysis of

the cell phones pursuant to search warrant indicated that they were used, at least in part, for two-

factor authentication, a common security measure in the cyptocurrency space. Behind the desk

in the Office were three desktop computers (there were other computers in the room but they did

not appear to be set up), two of which appeared to be the only computers plugged in to the power source in the wall. Two of the desktop computers were connected to monitors that were sitting on the desk in a manner that would suggest someone was using those computers. The two desktop computers were also plugged into the wall. However, at the time law enforcement entered the house, the power supply to the desktop computers (i.e., the connection of power to the computer, not to the wall) was disconnected as to both computers. At least one of the hard drives was encrypted, so cutting the power supply to the computer, generally speaking, makes it more difficult to recover and copy the content of a computer as opposed to if the computer is on and operating.

In other words, it appears that Goettsche may have gone to his office to disconnect the power supply to these computers rather than complying with law enforcement's orders to open the door so that it would be difficult if not impossible for law enforcement to obtain the encrypted content inside of his computers.

### ii. Goettsche's Demonstrated Character Warrants Detention

Goettsche orchestrated a fraud in which he and his co-conspirators accepted millions of dollars from investors while lying to them about what they were earning as a part of their investment. He also spoke quite freely about lying to auditors to help his exit strategy from BitClub Network. In late September 2017, in talking about his exit strategy from the company, Goettsche and Balaci had the following exchange:

| GOETTSCHE | if we do this exit right, its really game over man! talking Billion dollar play here |
| BALACI | *broken down into days |
| GOETTSCHE | great |
| GOETTSCHE | are we ready to move to new platform? |
| BALACI | going public exit? or? |

| GOETTSCHE | or still working on it |
| GOETTSCHE | yea public |
| GOETTSCHE | full audit |
| GOETTSCHE | ***and we can make up the numbers anyway we want to appease auditors*** |
| BALACI | geez |
| GOETTSCHE | as long as we have good stats ☺ |

In addition to planning on being untruthful with auditors, it appears that Goettsche

exploited even critical co-conspirators like Balaci when it suited his needs:

| BALACI | in Feb he told me to buy and rent extra space and deal with the power for at least an extra 25MW. So i did, did rental agreements, bought land and a high voltage transformation station, prepped everything ans pent a lot |
| BALACI | this month (when I flew to Canada) he told me that the only way he will buy from me is if I give him 50% of my company |
| INDIVIDUAL | [omitted] |
| BALACI | so he put me with my back at the wall because I trusted him (spent a ton of money, + 5 year rent of 50k a month) and now takes advantage of it |
| INDIVIDUAL | [omitted] |
| INDIVIDUAL | [omitted] |
| BALACI | this, after i literally made him hundreds of mil in the past 2 years with his stupid projects |
| INDIVIDUAL | [omitted] |
| BALACI | he literally has an island in Belize and a private plane |
| BALACI | yeah... I do not get it honestly |
| BALACI | because with this dick move he lost me |
| BALACI | for the past 11 years I was hi loyal dog, did not work for anybody else |
| BALACI | and now he screws me like this... |

In other words, Goettsche has a demonstrated history of willingness to lie and manipulate

others when it serves his best interest.  This behavior suggests that the Court should be skeptical

about any promises Goettsche makes that he will abide by conditions of release.

### iii.   Goettsche's Family Involvement in the Offense Conduct Warrants Detention

While members of Goettsche's family reside in the United States, they have incentive to

assist Goettsche in escaping federal custody.  Several courts have recognized that "the mere

presence of defendant's immediate family" is insufficient "to assure his presence at trial." *United States v. Abdullahu*, 488 F. Supp. 2d 433, 442 (D.N.J. 2007); *see also United States v. Reuben*, 974 F.2d 580, 586 (5th Cir. 1992) ("The family ties must be the type of relationship that exert a level of control that would prevent the defendant from fleeing.").

For one, while the investigation remains ongoing, it appears that Goettsche's brother (the "Brother") was an integral part of the BitClub Network scheme and worked alongside Goettsche. At the beginning of the scheme in 2014, Goettsche asked Balaci to set up three administrative accounts which appear to be for the BitClub Network site: one for him, one for the sealed codefendant, and one for the Brother. The evidence then shows that, throughout the course of the BitClub Network scheme, the Brother continued to be involved in the BitClub Network and continued to have high-level administrative access to the website. In a 2018 email from an account law enforcement believes was utilized by the Brother, the Brother appears to list out a "to do" list for BitClub Network, referencing that he needed to check with "Matt" (Goettsche) and "Cata" (codefendant Catalin Balaci). The list contained the following:

> Members ask about the specs of their mining and complain on the amounts they receive.
>
> - I hit them with a BS response that says all shares are earning and getting the convenience of not having to pay a power bill, or maintaining their machine, and if the machine breaks it's replaced here at BCN and not at home if they were to have purchased it. Is this good? Help is needed for this AMMO.

On the day of the takedown, law enforcement executed a search warrant at the Brother's house in Utah. Law enforcement found, among other things, notes related to BitClub Network and a white board that had displayed something to the effect of: "Its okay to take advantage." The Brother's involvement and the Government's ongoing investigation weighs in favor of

Goettsche's pretrial detention.

Further, on December 10, 2019, after Goettsche and several of his co-conspirators were arrested, law enforcement attempted to serve Goettsche's Brother at a house that Goettsche owns and where Goettsche's parents appear to reside.  Law enforcement knocked on the door and Goettsche's mother answered the door.  Law enforcement told Goettsche's mother that they wanted to speak with the Brother.  Goettsche's mother then seemed hesitant to confirm whether the Brother was also in the house until law enforcement pressed and told Goettsche's mother that they knew the Brother's car was parked in front of the house.

Further, when he was arrested, Goettsche was overheard directing his wife to "call [Subject 1]."  Subject 1 is a person who has worked with Goettsche to set up entities and accounts domestically and overseas, which have been used to receive millions of dollars.  In another location, Subject 1 was speaking to law enforcement about his relationship with Goettsche.  During the interview, Goettsche's wife—as instructed by Goettsche—called Subject 1.  Thereafter, Subject 1 ended the interview.

If Goettsche is convicted, his family would lose the primary source of the vast wealth it has accumulated through the BitClub Network scheme; in light of this, their existence in Goettsche's community do not lean in favor of his pretrial release.

### iv.   Goettsche's Financial Resources, Entities, and Properties Warrant Detention

While the Government's investigation is ongoing, the Government has learned that Goettsche likely had access at various points of the scheme to hundreds of millions of dollars, and that he has used entities, properties, law firms, and cryptocurrency exchanges, among other methods, to make tracing those millions incredibly complicated.  His access to wealth from

anywhere in the world is so overwhelming there is no combination of conditions that would make fleeing the country anything more than a minor inconvenience.

### Cryptocurrency Transfers From Recovered Cold Storage Devices

During the execution of the search warrant in this case, law enforcement recovered several cold storage devices.  A cold storage wallet is an offline wallet that can store cryptocurrencies.  From those cold storage wallets, law enforcement has used software to essentially recreate the transfers of cryptocurrency that were sent from these cold storage wallets.  This process has revealed the following:

| Cold Storage Device | Number of Transfers | Date Range of Transfers | Amount of Transfers in BTC | Equivalent in U.S. Dollars |
|---|---|---|---|---|
| 1 | 1 | 5/8/2015 | 31 | $7,666 |
| 2 | 30 | 12/29/2017-7/23/2018 | 8961 | $117,805,196 |
| 3 | 1 | 8/24/2017 | 310 | $1,301,208 |
| 4 | 3 | 5/7/2015-3/18/2016 | 171 | $62,640 |
| 5 | 2 | 10/9/2017 | 89 | $415,435 |
| 6 | 3 | 5/7/2015-3/8/2016 | 172 | $63,652 |
| 7 | 2 | 12/3/2019 | 2 | $16,659 |
| 8 | 1 | 11/14/2018 | 50 | $311,569 |
| 9 | 4 | 8/5/2017-1/14/2018 | 7346 | $44,449,220 |
| 10 | 2 | 2/17/2016 | 76 | $31,615 |
| 11 | 22 | 10/8/2017-4/29/2018 | 10,700 | $76,781,382 |
| 12 | 1 | 2/28/2019 | 133 | $511,532 |
| 13 | 5 | 11/25/2018-12/8/2019 | 1303 | $4,713,742 |
| | | | **Total Transfers** | **$246,471,516** |

Based on the devices recovered from his residence alone, Goettsche has had access over the course of this scheme to cold storage wallets that have transferred nearly $250 million in

cryptocurrency. While the analysis is ongoing, from our preliminary investigation it appears that between October 2017 to January 2018, at least six of these transfers totaling approximately 619 BTC—the equivalent of approximately $5,723,124—went to Binary Financial, a Hong Kong-based investment management company.

**Crypto Exchange Accounts**

In addition to the above, law enforcement has insight into accounts that Goettsche appears to maintain at cryptocurrency exchanges, some located abroad. Bitcoin exchangers allow holders of Bitcoin to exchange Bitcoin for currency, such as U.S. Dollars, or for other virtual currencies. A cryptocurrency exchange, among other things, allows one to swap out cryptocurrency for fiat currency. Based on the investigation to date, it appears that Goettsche has at least the following:

- Goettsche maintained an account with Xapo, which is a Hong Kong-based company providing bitcoin wallets, a cold storage vault, and bitcoin-based debit cards. From 2014 through 2017, Goettsche received at least 743 BTC—the equivalent of approximately $314,237.41—into this account.

- Goettsche maintained an account with Poloniex, which is a U.S.-based digital asset exchange involving cryptocurrency. From 2017 to 2018, Goettsche received approximately 2291 BTC, approximately $2,642,162—in transfers. According to a screenshot of Goettsche's account taken in December 2017, the estimated value of Goettsche's holdings with Poloniex was worth 612.70167267, or approximately $9,437,211.04 in U.S. dollars. *See* Ex. F (Dec. 27, 2017 Poloniex Account Screenshot).

- Goettsche maintained an account with Gemini Trust, which is a New York-based digital asset exchange. From 2015 to 2017, Goettsche received approximately 2,419.803467 BTC, or about $2,642,162.47 in U.S. dollars into this account.

- Goettsche maintained an account with Coinbase, a San Francisco-based digital currency exchange. From 2014 to 2017, Goettsche received approximately 3,695.189701 BTC, or about $2,095,613.45 in U.S. dollars.

- Goettsche maintained one or more accounts with Bitfinex, which is headquartered in Hong Kong and registered in the British Virgin Islands. From 2018 to 2019, Goettsche received at

least $17,865,484.82 worth of BTC into his account(s) with Bitfinex.

The above is not a complete screenshot of Goettsche's source of cryptocurrency accounts. As he explained to itBit, a NY-based financial services company that trades and custody services for cryptocurrencies, Goettsche has been engaging in cryptocurrency mining in several cryptocurrency pools, has "several trading accounts on just about all of the exchanges," and when asked about which third-party bitcoin wallets Goettsche utilizes, he responded "ALL OF THEM!" *See* Ex. G (Oct. 11 2016 Email from Goettsche to itBit).

### Money Transfers Through Entities and Law Firms

Goettsche has utilized several entities and seemingly at least two law firms to move funds to and from accounts around the world. For example:

- Goettsche created Getch Holdings LLC to liquidate his cryptocurrency holdings. There appear to have been several transfers that funneled through this entity, including the following:

  - In January 2018, a wire transfer of approximately $2.497 million was transferred from a company in the British Virgin Islands—believed to be created by Bitfinex—to an RHB Bank account located in Singapore for Getch Holdings LLC;

  - Between February 2018 through March 2018, Getch Holdings LLC received three incoming wire transfers totaling approximately $5.237 million from Lantau Peak Trading in Hong Kong held at a China Construction Bank Corporation, which also is believed to be from Bitfinex.

- Bank records show that approximately $18.7 million was deposited to accounts either controlled by Goettsche, on behalf of Goettsche or at the request of Goettsche from a prepaid credit card service called "AU Card." He has provided authorization to send wires to entities Bitwealth Holding and Granite Mountain Technologies. It appears that transfers from AU Card—which also appears to have been used by Goettsche's codefendants—were made to Bitwealth Holdings (approx. $7.3 million), Cryptowatt Mining ($4.5 million), one of the law firms Goettsche appears to use to move money ("Law Firm 1") ($2,870,000), ITX Enterprises ($3 million) and a bank account in Costa Rica for the purchase of property (approximately $1 million).

- During the period January 30, 2018 through November 20, 2018, Goettsche deposited

approximately $28.5 million to a brokerage account he controlled at RBC Wealth Management in the name of Getch Holdings through a series of twelve wire transfers. The source of these transfers was from Bitfinex, the cryptocurrency exchanger referenced above. The transfers from Bitfinex to RBC Wealth Management were made through three international bank accounts that Bitfinex controls – Lantau Peak Trading, Amazing Partners Limited and an account at Sackville Bank and Trust. The investigation to date has revealed that at least $17 million of the $28 million that flowed through Goettsche's Bitfinex account likely originated from bitcoin wallets that were funded by BitClub Network investors.

- As deposits came in to the account from Bitfinex, Goettsche began making disbursements out of his Bitfinex account. In total, these disbursements come to approximately $23 million. Some of these payments out of the account include:

  o Approximately $6.7 million for the purchase of real estate and other business investments, including real estate in Belize, interest in a currently operational fitness club in Las Vegas, Nevada and purchase of two Colorado commercial properties that were planned to generate rental income.

  o Approximately $4.2 million to a company that provides tax consulting services

  o Approximately $5.2 million in transfers to other Goettsche accounts at RBC Wealth Management.

- In 2018, Goettsche had an interest in an account that contained $9 million as the high balance for that year. OSL is a company in Hong Kong and is related to Octagon Strategy Limited. Octagon Strategy Limited made several wire transfers to Cryptowatt, a bitcoin mining equipment company of which Geottsche was the CEO. It appears that a total of approximately $81 million has been transferred from Octagon Strategy to Cryptowatt. It also appears that Goettsche controls and/or has access to the resources of this account.

- Goettsche has at least two accounts with Commerzbank in Frankfurt, Germany in the name of Bitchain GMBH and Subject 1 is the named principal on the accounts (the "Bitchain GMBH Accounts"). From August 2017 to May 2018, the Bitchain GMBH Accounts received four wire transfers totaling approximately $6.35 million that are notable:

  o Approximately $950,000 from Law Firm 2

  o Approximately $2,000,000 from an AU card account

  o Approximately $2,000,000 from a Law Firm 1 account

  o Approximately $1,400,000 from another Law Firm 1 account

- Law Firm 1 and Law Firm 2 appear to have run at least $26 million of money owned directly

or indirectly by Goettsche through the course of the scheme.

**Goettsche Properties**

Goettsche has access to a large number of properties.  *See* Ex. H (redacted list of properties found from Goettsche account).  In addition to several domestic properties, Goettsche has purchased several foreign properties through the course of this scheme.  For one, he has purchased Hatchet Caye Island in Belize for approximately $6.4 million in late 2017, which he appeared to procure through transactions involving Law Firm 1.  *See* Ex. I ("If [Law Firm 1] 'gifts' Hatchet Caye Limited and Argo Services Limited to Matt G, will funds still be sent to Belize via his company [Law Firm 1]?").  From late 2017 through October 2019, Law Firm 1 has sent wire transfers totaling approximately $7,598,108 to Hatchet Caye Ltd Atlantic Bank in Belize.

Goettsche joked about how he was planning to make this island "his own country" with "citizens" having "blonde hair and blue eyes":

| 10/17/2017 | INDIVIDUAL | Doty man said you picked up that island. Congrats brotha |
|---|---|---|
| 10/17/2017 | GOETTSCHE | yes sir |
| 10/17/2017 | GOETTSCHE | big pimping on my own island bro |
| 10/17/2017 | GOETTSCHE | planning to make it my own country |
| 10/17/2017 | GOETTSCHE | and looking for citizens |
| 10/17/2017 | INDIVIDUAL | haha, well let me know and I'll submit my application LMAO |
| 10/17/2017 | GOETTSCHE | we are going to do it like they did iceland |
| 10/17/2017 | GOETTSCHE | rape and pillage some villages looking for blonde hair and blue eyes |
| 10/17/2017 | INDIVIDUAL | absolutely, keep the blood line pure |
| 10/17/2017 | GOETTSCHE | lol you know it |
| 10/17/2017 | INDIVIDUAL | is it sick? I know you went down there to check it out |
| 10/17/2017 | GOETTSCHE | its so sick! |
| 10/17/2017 | GOETTSCHE | ill show you a video next time we hangg |

| 10/17/2017 | INDIVIDUAL | | word looking forward to it |
|---|---|---|---|

It also appears that Goettsche has used the Belize property to host people with tremendous resources and international ties, including Sir Richard Branson.  *See* Ex. J (June 1, 2018 draft email re: Richard Branson).

In addition to the Belize island, Goettsche also has at least one, possibly two properties in Costa Rica.  He also has a fractional interest in condominium in St. Kitts, apparently shared with codefendant Jobadiah Weeks.  Through this St. Kitts purchase, it appears also that Goettsche purchased St. Kitts citizenship.  *See* Ex. K (Economic Citizenship Agreement with St. Kitts).

Many of Goettsche's properties appear to generate income, which means that if Goettsche were to flee to avoid prosecution, he could continue to receive substantial amounts of money from anywhere in the world by way of these properties.

**v.   Goettsche's Private Plane and Significant Foreign Travel Warrants Detention**

Goettsche has a history of extensive travel.  The following reflects records of some of Goettsche's international travel:

| Date | Arrival | Departure |
|---|---|---|
| 11/30/2019 | Colorado | Costa Rica |
| 11/24/2019 | Costa Rica | Colorado |
| 10/26/2019 | Colorado | Cabo San Lucas, Mexico |
| 10/19/2019 | Belize | Colorado |
| 10/7/2019 | Colorado | London |
| 9/29/2019 | Montreal | Florida |
| 8/6/2019 | Colorado | Belize |
| 7/29/2019 | Belize | Colorado |
| 5/29/2019 | Colorado | Belize |
| 5/20/2019 | Belize | Colorado |
| 5/12/2019 | Colorado | Goose Bay, Canada |
| 5/6/2019 | London | New Jersey |
| 4/20/2019 | Colorado | Mexico |

| 4/17/2019 | Mexico | Colorado |
| 3/20/2019 | Belize | Colorado |
| 1/6/2019 | Houston | Belize |
| 1/3/2019 | Belize | Colorado |
| 12/20/2018 | Colorado | Germany |
| 12/17/2018 | Germany | Colorado |
| 11/24/2018 | Florida | Bahamas |
| 11/18/2018 | Bahamas | Colorado |
| 11/5/2018 | El Paso | Mexico |
| 11/2/2018 | Mexico | Colorado |
| 8/16/2018 | Houston | Belize |
| 8/10/2018 | Atlanta | Jamaica |
| 6/18/2018 | Houston | Belize |
| 5/6/2018 | Miami | Macedonia |
| 4/17/2018 | South Padre Island | Belize |
| 3/29/2018 | Houston | Belize |
| 3/19/2018 | Germany | Denver |
| 2/21/2018 | Denver | London |
| 2/16/2018 | Iceland | Denver |
| 2/12/2018 | Houston | Belize |
| 1/8/2018 | Denver | London |
| 1/2/2018 | Germany | Denver |
| 12/4/2017 | Denver | Tokyo |
| 11/28/2017 | South Korea | San Francisco |
| 10/28/2017 | Los Angeles | Dubai |
| 9/20/2017 | Houston | Belize |
| 9/9/2017 | Denver | Germany |
| 8/4/2017 | Denver | Tokyo |
| 7/27/2017 | Hong Kong | Los Angeles |
| 6/21/2017 | Minneapolis/St. Paul | Iceland |
| 6/9/2017 | New York | Germany |
| 4/11/2017 | Dallas | Tokyo |
| 3/22/2017 | Denver | Germany |
| 12/11/2016 | Seattle | South Korea |
| 10/20/2016 | New York | Germany |
| 10/10/2016 | Houston | Costa Rica |
| 9/30/2016 | Denver | Iceland |
| 6/30/2016 | Dallas | Hong Kong |
| 5/23/2016 | Seattle | South Korea |

In addition, Goettsche appears to have access to a private plane, registered in an account

called Tango & Cash LLC.  The price of this plane appears to have been purchased from an account in the name of Most Amazing Box LLC, which appears, in turn, to be funded by a Singapore-based cryptocurrency trading exchange.  Getch Holdings, one of Goettsche's entities, pays for the insurance on this aircraft.

In addition to this private plane, a second private plane, which law enforcement suspects is utilized by Goettsche's codefendant who has not yet been apprehended, appears to have been purchased through Law Firm 1.  So, even if Goettsche were to relinquish access to his private plane, one of his coconspirators who is suspected to be located overseas and is not yet arrested is believed to have access to at least two other private planes, which Goettsche could also utilize in short order.

* * * *

In sum, Goettsche has orchestrated a fraud scheme that took in hundreds of millions of dollars from investors.  He has access to and has distributed hundreds of millions of dollars himself; however, law enforcement has not been able to trace, locate, and seize much of this lost investor money.  As a result, Goettsche's ability to live comfortably anywhere in the world and avoid prosecution cannot be tempered by conditions of release by this Court.  In addition, there is an outstanding codefendant living abroad with whom Goettsche has had a long time business partnership, and who also has an interest in helping Goettsche escape law enforcement.  In addition to money, Goettsche has access to several private planes and foreign contacts around the world.  Under these circumstances, detention is appropriate.  *See, e.g.*, *United States v. Armstrong*, 397 F. App'x 466 (10th Cir. 2010) (upholding detention where defendant was accused of tax fraud totaling approximately $1.6 million, that approximately $400,000 appeared

to be transferred to international financial institutions and was not traceable, defendant had property overseas and traveled frequently to Mexico).

### D. *The Nature and Seriousness of the Danger to Any Person or Community Posed by Goettsche's Release*

It is worth noting the seriousness of this offense and the likelihood that Goettsche could continue to defraud individuals of money by using the website programs in place for BitClub Network and merely rebranding the fraud scheme under some other name. The BitClub Network operates via a website and has taken significant money from victims to date. Allowing Goettsche the opportunity to spin up another Internet fraud utilizing the same multi-level marketing/ponzi structure the he employed with the BitClub Network would pose a risk worldwide. It appears that BitClub Network has targeted economically developing countries. And this is not a victimless crime. As explained by one victim in an email to BitClub Network's customer support:

> Once beeten [sic] twice shy. **With this ponzi sheme you got ( dubed thousands of people from my country Cameroon including me** , now you send me messages are u really serious????. **U shall rot in hell for the amount of people you rendered homeless** and frusterated in prisons . U will die likea fowl. Nemsiss will catch up with you[.]

/

/

/

/

/

/

/

/

For all of these reasons, the Government respectfully requests that Goettsche be detained

pending his trial.

Respectfully submitted this 13th day of December 2019.

JASON R. DUNN
United States Attorney

*s/ David Tonini*
DAVID TONINI
Assistant United States Attorney
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0406
E-mail: David.Tonini@usdoj.gov
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2019, I electronically filed the foregoing **UNITED STATES' MOTION FOR GOETTSCHE'S PRETRIAL DETENTION** with the Clerk of the Court using the CM/ECF system. A copy of this motion was immediately sent to counsel for the defendant via email to the following e-mail addresses:

Kristen Frost:  frost@ridleylaw.com

Patrick Ridley:  ridley@ridleylaw.com

*s/ Portia Peter*
Legal Assistant